UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TODD GRAY,

    Plaintiff,   File No. 1:24-CV-

v.   Hon.

GRAND RIVER BANK and
GRAND RIVER COMMERCE, INC.,

    Defendants.
_____

**COMPLAINT AND JURY DEMAND**
_____

COMPLAINT

    Now comes Plaintiff, Todd Gray, by and through his attorneys, and states as follows:

PARTIES AND JURISDICTION

    1.    This is an action requesting the Court to remedy violations of Plaintiff's rights to be free from retaliation under the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), 12 U.S.C. § 1831j(a), and Michigan's Whistleblower Protection Act (WPA), Mich. Comp. Laws § 15.361 *et seq.*

    2.    Plaintiff, Todd Gray, is a former employee of Grand River Bank and resides in Kent County in the Western District of Michigan.

1

3. Defendant Grand River Commerce, Inc., is a Michigan corporation headquartered in Grandville, Michigan.

4. Defendant Grand River Bank is chartered by the State of Michigan and is a member of the Federal Deposit Insurance Corporation (FDIC) and the Federal Reserve. Grand River Bank is a wholly-owned subsidiary of Grand River Commerce, Inc., and operates banks throughout the greater Grand Rapids area.

5. This Court has subject matter jurisdiction based on 28 U.S.C. § 1331.

6. This Court may exercise supplemental jurisdiction over the state law claims asserted because they arise from a common nucleus of operative facts and are so related with the federal claims asserted as to form part of the same controversy under Article III of the U.S. Constitution, pursuant to 28 U.S.C. § 1367(a).

7. Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL BACKGROUND

8. Grand River Bank (GRB) is a community bank that was established in 2009 by local founding investors, including Robert Bilotti. Mr. Bilotti is the Chairman of the Board of Directors for GRB. Mr. Bilotti also serves as the Chairman, President, and CEO for Grand River Commerce, the holding company for GRB.

9.      Until his termination, Plaintiff was the Senior Vice President of Retail Lending at GRB, where he achieved significant success. Under Plaintiff's leadership, his team contributed more to GRB's bottom line on a headcount basis than any other comparable division of the bank. Through his work at GRB and other community banks, Plaintiff has developed a reputation for a high level of competence and success in the mortgage industry.

10.     GRB's primary line of business and focus has always been commercial lending. In 2021, however, the Board of Directors of Grand River Commerce approved the formation of Grand River Mortgage Company (GRMC) to launch a new direct-to-consumer residential mortgage division with a national footprint. GRMC was structured as a wholly-owned subsidiary of GRB.

11.     Mr. Bilotti championed and initiated the decision to launch GRMC – without seriously considering the input of senior management at GRB, including Plaintiff. Although Plaintiff had more than 25 years of experience in the mortgage industry, the Board did not seek his opinion about its plan to expand GRB's business to include a new mortgage company in an area of business – direct-to-consumer, a largely lead-based debt consolidation sales model – which carries a high level of risk. Moreover, the Board largely ignored the risk analysis report conducted by GRB's senior management, which concluded that a new mortgage business would cause a strain on capital and expressed concerns about the lack of industry knowledge and significant issues with scale.

12. Mr. Bilotti named himself CEO of GRMC – even though he had little relevant experience in the mortgage industry and continued to serve as Chairperson of the Board of Grand River Commerce – without initial approval from the Board. Mr. Bilotti served as CEO for several months before the Board took appropriate action to approve that appointment, violating Board governance requirements.

13. Because of his experience in the mortgage industry, Plaintiff believed that the new mortgage business had significant risks that did not justify the potential rewards. Plaintiff understood that the nature of the new operation was one of the riskiest mortgage models because it involved all customer acquisition with no existing customer-based or offsetting servicing assets. Moreover, the cost of marketing and the premium placed on lead conversion would be significant. Finally, the timing of the new venture provided Plaintiff with further cause for concern, since GRB would be entering the mortgage arena just as rates were expected to increase. Plaintiff began expressing his concerns to Mr. Bilotti and senior management at GRB as soon as he learned of plans to launch the mortgage division in 2021.

14. Drawing on his years of experience and connections in the mortgage industry, Plaintiff shared with Mr. Bilotti and executive management that mortgage executives at other financial institutions had expressed surprise about GRB's plan to launch the new mortgage business because it could lead to capital drain at a time where experts anticipated upcoming adverse market conditions. Mr. Bilotti was not interested in hearing about what others in the industry were saying,

4

however, and scolded Plaintiff for raising concerns. Rather than listen to Plaintiff's warnings, Mr. Bilotti began to sideline Plaintiff, particularly from dealings with the buildout of the new mortgage business at GRMC, and later with the operations.

15. The members of the GRB Board did not have significant experience or contacts in the mortgage industry. As the Board was considering the new mortgage business, Plaintiff reached out to several Board members to share his expertise in the mortgage industry and his concerns with the new venture. It quickly became clear to Plaintiff that the members of the Board did not have a clear understanding of the mortgage industry and that they were relying on Mr. Bilotti to explain the industry.

16. Mr. Bilotti presented to the Board revenue projections for the new mortgage business that were overly optimistic and did not reflect reality. Mr. Bilotti did not address, nor did the Board seriously question, the underlying assumptions used to create those revenue projections. When senior staff with mortgage experience, including Plaintiff, challenged Mr. Bilotti's projections, they were shut down.

17. In May 2022, Plaintiff voiced his concerns at a meeting of the GRB Board of Directors. Plaintiff also expressed his frustration that senior management with relevant experience had not been consulted about the decision to launch the mortgage division. Based on the reaction from some Board members, Plaintiff believed that Mr. Bilotti had led the other Board members to believe that Plaintiff was involved with the decision to launch GRMC – which was entirely false.

5

18. After the meeting, Jill Redder, who took the Board minutes, sent her notes on Plaintiff's portion of the Board presentation to Plaintiff to review for accuracy. Plaintiff approved Ms. Redder's summary with a couple edits. A couple weeks later, however, Ms. Redder called Plaintiff to inform him that she had been instructed to change the minutes so that they made it appear that Plaintiff was eager to help with the new mortgage business.

19. Following the May 2022 Board meeting, Plaintiff learned that Mr. Bilotti had sent an email to the Board disparaging Plaintiff. Mr. Bilotti told Board members that Plaintiff was full of ambition and that his views about GRMC were clouded by his own personal agenda. Mr. Bilotti acknowledged that Plaintiff had been opposed to the decision to launch GRMC since 2021, and urged Board members not to speak to Plaintiff about issues related to GRMC.

20. In November 2022, Plaintiff met with Mr. Bilotti and GRB's CEO, Patrick Gill, at an industry event in Grand Rapids. Mr. Bilotti told Plaintiff never to speak with anyone on GRB's Board about anything related to GRMC. This conversation made clear that Mr. Bilotti would not tolerate any dissenting views about GRMC, including views about whether the bank was taking on risks that could adversely affect shareholders or jeopardize GRB's stability. Plaintiff later learned that Mr. Bilotti had compiled a list of all employees opposed to GRMC, with the help of the human resources department.

21. After Mr. Bilotti's admonition not to speak to Board members, Plaintiff continued to report his concerns to GRB's executive management. Plaintiff reached

out to Mr. Gill and GRB's President and CFO, Elizabeth Bracken, repeatedly to share his concerns as the mortgage industry rapidly declined in 2022.

22. Plaintiff's concerns extended beyond the risks involved in the GRMC, and also included issues of corporate governance. Plaintiff learned that GRMC's President had signed a multi-million-dollar contract for technology services without formal Board approval, even though corporate policies clearly required Board approval for contracts of that size.

23. Plaintiff's concerns about the mortgage business proved to be well-founded. In 2022, Grand River Commerce reported a net loss of $2.2 million, and GRB posted a net loss of $1.5 million. Defendants attributed the loss to "expenses associated with the development of [GRMC]," and noted that GRB would have generated a net income of $2.1 million if GRMC's losses were excluded.

24. Although Defendants had previously told shareholders that they expected GRMC to generate meaningful revenue from loan originations and recapture its start-up expenses in the first half of 2023, that did not come to fruition. For 2023, GRB reported after-tax operating losses of $6.4 million, and Grand River Commerce reported operating losses of $7.3 million. According to Defendant's public financial statements, "[v]irtually all of the losses were attributable to the inability of the Bank's nationwide mortgage subsidiary, [GRMC], to achieve anticipated volumes and revenue." Because of GRMC's continuing losses, GRB's Board approved winding down GRMC's operations in late 2023.

25. By the time that the Board made the decision to shut down GRMC, it had committed roughly $12 million to the venture. The initial projection required GRB to commit $1.5 million to GRMC to get the mortgage division up and running, at which point it would move to self-sufficiency. GRMC never achieved self-sufficiency, however, and continually required more capital. Mr. Bilotti repeatedly provided reprojections to the Board, and GRMC failed to meet those projections as well. Nonetheless, the Board repeatedly approved requests from GRMC to provide more shareholder capital – even though interest rates were rapidly rising and there was no evidence that GRMC was headed in the right direction.

26. The capital losses attributable to GRMC forced GRB to go to the secondary market for additional capital. Because of their financial position, GRB was forced to work with a lead investor that specialized in taking interest in distressed banks and set terms for GRB's subordinated debt that were less favorable than market rates. The payments on this subordinated debt will negatively affect GRB for years to come and will add another layer of difficulty to becoming profitable.

27. The changes in Defendants' financial stability were monitored by the Federal Reserve Board of Governors (the "Federal Reserve"), which supervises GRB and other financial institutions. The Federal Reserve monitors, inspects, and examines those financial institutions to ensure that they comply with rules and regulations, and that they operate in a safe and sound manner. As part of its

supervisory duties, the Federal Reserve conducts annual on-site examinations of banks that it supervises, including GRB. *See* 12 U.S.C. §1820(d)(1).

28. In Spring 2023, the Federal Reserve conducted its annual on-site examination of GRB. When that examination concluded, the Federal Reserve scheduled a follow-up examination for November 2023. The Federal Reserve's decision to return before the next annual examination was unusual and indicated that regulators had concerns about what they had discovered during the examination.

29. Prior to the scheduled follow-up examination, on October 18, 2023, Plaintiff submitted a whistleblower report to the Federal Reserve. Plaintiff reported the issues with the mortgage division that he had raised to GRB's Board and leadership since the announcement of the decision to launch GRMC. Plaintiff's complaint made clear that he believed that the Board was violating its fiduciary duty and violating rules of corporate governance. Representatives of the Federal Reserve advised Plaintiff that his report would be passed on to local regulators who were conducting the on-site examination.

30. Although Plaintiff's whistleblower report was made anonymously, Plaintiff notified high-level management employees at GRB that he had filed the report with the Federal Reserve.

31. On November 13, 2023, the Federal Reserve conducted its follow-up examination. Previously, GRB would conduct de-brief meetings with department heads and senior staff, including Plaintiff, following an examination. After the

examination in November 2023, however, Plaintiff was not invited to any such meeting.

32. Shortly thereafter, Plaintiff learned that GRB's provider of Directors and Officers (D & O) Insurance had refused to renew its D & O coverage due to concerns about potential liability. GRB had been forced to go into the market to get insurance coverage, and ended up paying significantly more than it had previously.

33. In Spring 2024, the Federal Reserve returned to GRB for its annual examination. Although annual examinations were typically conducted by Federal Reserve staff from Chicago, that examination had been elevated to a team of regulators from Washington, D.C., because of concerns about the health and viability of GRB.

34. As a result of that examination, the Federal Reserve took confidential regulatory steps designed to shore up GRB's corporate decision-making and support its financial stability. Again, unlike in prior years' exams, GRB did not invite Plaintiff to the formal debrief meeting, led by the on-site examiners, after the examination in Spring 2024.

35. Upon information and belief, the information contained in Plaintiff's whistleblower report aided the examination performed by the Federal Reserve and directly contributed to its confidential regulatory steps with respect to GRB.

36. On July 8, 2024, GRB terminated Plaintiff's employment. Upon information and belief, GRB's decision to terminate Plaintiff was based at least in

part in retaliation for Plaintiff's filing a whistleblower report and/or GRB's belief that Plaintiff was about to file a negative report with GRB's regulators.

37. Defendants have evaded any real accountability for their reckless decisions related to GRMC. Upon information and belief, Defendants' executives and Board members believed there was a serious risk that Plaintiff would inform regulators about GRB's failures to meet basic standards of corporate governance and the GRB Board's failure to satisfy its duties of diligence and care.

### Count I: Violation of FIRREA, 12 U.S.C. § 1831j(a) – Grand River Bank

38. Plaintiff reaffirms all previous paragraphs as if restated herein.

39. Grand River Bank is an insured depository institution.

40. Plaintiff was an employee of Grand River Bank.

41. Plaintiff reported a violation of a law or regulation to the Federal Reserve.

42. Plaintiff further reported to the Federal Reserve that Grand River Bank was being grossly mismanaged and wasting funds.

43. The Federal Reserve is a federal banking agency.

44. Grand River Bank terminated Plaintiff's employment because of Plaintiff's whistleblower report to the Federal Reserve. At minimum, Plaintiff's whistleblower report was a contributing factor in Grand River Bank's decision to terminate Plaintiff.

45. As a result of the foregoing, Plaintiff lost earnings and benefits and future earnings and benefits and suffered mental anguish, emotional distress,

11

unfair reputational damage, and undue harm to his career, for which Defendant is liable.

WHEREFORE, Plaintiff requests that the Court grant him judgment against Defendant Grand River Bank including the following relief: (1) an award of lost wages and benefits; (2) an award of future lost wages and benefits; (3) compensatory damages for emotional and mental distress; (4) punitive damages in an amount as determined by a jury; plus (5) interest and costs, including reasonable attorney's fees, and any other relief deemed necessary and proper by the Court.

### Count II: Violation of Michigan's Whistleblower Protection Act (WPA)

46. Plaintiff reaffirms all previous paragraphs.

47. Grand River Bank and Grand River Commerce are each an "employer" of Plaintiff as defined by WPA.

48. The Federal Reserve Bank is a "public body" as defined by the WPA.

49. Michigan law requires directors of a bank to discharge their duties with the degree of diligence, care, and skill that an ordinarily prudent person would exercise. MCL 487.13504.

50. Plaintiff reported violations of the law, and/or what he suspected in good faith were violations of the law, when he made a whistleblower report to the Federal Reserve Bank charging that GRB's directors were violating their fiduciary duties.

51. Defendants terminated Plaintiff's employment at least in part because of Plaintiff's report to the Federal Reserve Bank.

52.     Defendants' termination of Plaintiff was a violation of WPA, for which Defendants are liable to Plaintiff for damages under WPA.

53.     As a result of the foregoing, Plaintiff lost earnings and benefits and future earnings and benefits and suffered mental anguish, emotional distress, unfair reputational damage, and undue harm to his career, as well as incurred attorney fees, for which Defendants are liable.

WHEREFORE, Plaintiff requests that the Court grant him judgment against Defendants including the following relief: (1) an award of lost wages and benefits; (2) an award of future lost wages and benefits; (3) compensatory damages for emotional and mental distress; (4) punitive damages in an amount as determined by a jury; plus (5) interest and costs, including reasonable attorney's fees, and any other relief deemed necessary and proper by the Court.

PINSKY SMITH, PC
Attorneys for Plaintiff

Dated: October 5, 2024     By:    /s/ Sarah R. Howard
Sarah Riley Howard
Elizabeth L. Geary
146 Monroe Center St NW, Suite 418
Grand Rapids, MI  49503
(616) 451-8496
showard@pinskysmith.com

## JURY DEMAND

Plaintiff demands a trial by jury.

                                        PINSKY SMITH, PC
                                        Attorneys for Plaintiff

Dated: October 5, 2024                By: /s/ Sarah R. Howard
                                        Sarah Riley Howard
                                        Elizabeth L. Geary
                                        146 Monroe Center St NW, Suite 418
                                        Grand Rapids, MI 49503
                                        (616) 451-8496
                                        showard@pinskysmith.com